707 F.2d 721
 Fed. Sec. L. Rep. P 99,196
Lucile LOWRY and Lowry-Zweig Corp., Appellants
v.
The BALTIMORE & OHIO RAILROAD COMPANY, The Chesapeake & Ohio
Railroad Company and Chessie System, Inc.
 No. 81-1976.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 16, 1981.
Reargued In Banc Nov. 8, 1982.
Decided May 10, 1983.
 
 Robert B. Block (Argued), Pomerantz, Levy, Haudek & Block, New York City, Leonard M. Mendelson, Hollinshead & Mendelson, Pittsburgh, Pa., for Lucile Lowry and Lowry-Zweig Corp.
 Richard T. Wentley (Argued), Anthony J. Basinski, Terrance K. Livingston, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for Baltimore and Ohio R. Co., The Chesapeake and Ohio R. Co. and Chessie System, Inc.
 Michael P. Malakoff, Berger, Kapetan, Malakoff & Meyers, P.C., Pittsburgh, Pa., for amicus curiae, Pittsburgh Terminal Corp., Monroe Guttmann, Loretta Guttmann, Janet Rees and Evelyn Bittner.
 Argued Dec. 16, 1981.
 Before ADAMS, GIBBONS and GARTH, Circuit Judges.
 Reargued In Banc Nov. 8, 1982.
 Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, HUNTER, GARTH, SLOVITER and BECKER, Circuit Judges.OPINION OF THE COURT
 PER CURIAM.
 
 
 1
 Lucile Lowry and Lowry-Zweig Corporation appeal from a summary judgment dismissing their class action complaint against the Baltimore & Ohio Railroad Company (B & O), the Chesapeake & Ohio Railway Company (C & O), and the Chessie System, Inc. The complaint alleged that defendants violated Sec. 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b); Rule 10b-5 of the Securities and Exchange Commission promulgated thereunder, 17 C.F.R. Sec. 240.10b-5 (1981); and state common law when, on December 13, 1977, B & O declared a dividend in favor of its common shareholders in the form of the entire stock of the Mid-Allegheny Corporation. This action was taken without giving notice to holders of B & O convertible debentures, thereby precluding their participation in the dividend distribution. In a previous decision, this court allowed persons who held B & O convertible debentures as of December 13, 1977 to maintain an action under Sec. 10(b) and Rule 10b-5. Here, appellants had purchased B & O convertible debentures from persons who held them as of December 13, 1977 and are attempting to assert their sellers' federal cause of action.[1] We conclude that the dismissal of appellants' federal claims was proper and affirm the district court's action as to them. We vacate and remand for further consideration of appellants' state law claims.
 
 
 2
 The B & O owns both rail and non-rail assets and has issued both common stock and convertible debentures. The C & O controls over 99% of B & O's common stock. There are thirteen other common shareholders and the shares are not publicly traded. The Chessie System is a holding company managing the assets of the C & O. The present controversy arose after B & O sought to restructure its operations in order to avoid federal restrictions that inhibited development of its non-rail assets. To accomplish this it created the subsidiary corporation, Mid-Allegheny, to which it transferred all of its non-rail assets. Then on December 13, 1977, B & O distributed all of the Mid-Allegheny stock to its own common shareholders. A consequence of this arrangement was that B & O convertible debentures, which previously could have been converted into B & O common stock representing both B & O's rail and non-rail assets, became convertible into B & O common stock representing only B & O's rail assets.
 
 
 3
 In a separate action, the debenture holders sued under the Securities Exchange Act of 1934 claiming that, as to them, the dividend declaration was fraudulent. They argued that the value of their conversion option, and hence of their convertible debentures, would be reduced unless they were allowed to convert in time to qualify for the Mid-Allegheny dividend. This court agreed, and concluded that B & O had a duty to provide debenture holders with advance notice of such a dividend declaration. Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R., 680 F.2d 933 (3d Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 476, 74 L.Ed.2d 621 (1982).
 
 
 4
 In the instant suit, appellants purchased B & O convertible debentures from persons who held them on December 13, 1977. Appellants argue that, even though they purchased with full knowledge of the dividend declaration and allege no injury therefrom, the federal cause of action established in Pittsburgh Terminal was automatically assigned to them upon their purchase of the debentures.
 
 
 5
 A majority of this court, albeit for diverse reasons, agree with the district court and conclude that appellants may not maintain a claim for which relief can be granted based on any violation of federal statutes or regulations. Two judges would overrule Pittsburgh Terminal and are of the opinion that B & O was under no legal obligation to provide holders of the convertible debentures with advance notice of the dividend. According to this view, if the prior holders have no federal cause of action, then a fortiori, neither do their purchasers, and the assignability issue need not be reached. Six members of the court are of the view that the holding in Pittsburgh Terminal should be honored here either because it is correct or binding. Three of the six judges who follow Pittsburgh Terminal conclude that the rights recognized in Pittsburgh Terminal are assignable only if there is an express provision to that effect. Because there was no express assignment here, these judges argue that appellants may not now assert their transferors' rights. The remaining three judges are of the view that the cause of action was automatically assigned to appellants as purchasers. These three members of the court would reverse the dismissal of the federal claims.
 
 
 6
 As to appellants' state law claims we vacate the judgment of the district court and remand with a direction that the district court consider whether appellants can maintain this part of their class action suit as a diversity action. The district court dismissed without explaining whether the jurisdictional requirements of 28 U.S.C. Sec. 1332 were met under Zahn v. International Paper Co., 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973). The district court may also wish to consider the possibility of state claims under pendent jurisdiction asserted by other litigants.
 
 
 7
 Accordingly, the judgment of the district court dismissing the federal claims of appellants will be affirmed. As to appellants' state law claims, the district court judgment will be vacated and remanded for further proceedings consistent with this opinion.
 
 
 8
 Each side to pay its own costs.
 
 
 9
 GARTH, Circuit Judge, concurring in the judgment, with whom SLOVITER, Circuit Judge, joins:
 
 I.
 
 10
 In Pittsburgh Terminal Corp. v. Baltimore & O. R.R., 680 F.2d 933 (3d Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 475-76, 74 L.Ed.2d 621 (1982), a panel of this court held that Rule 10b-17, 17 C.F.R. Sec. 240.10b-17 (1982), required notice to holders of convertible debentures of a dividend declared by B & O on December 13, 1977.[1] However, the panel was divided in its vote on Lowry, argued and considered by the panel with Pittsburgh, to the extent that no judgment could be entered. This in turn led to a recommendation that the full court sitting in banc entertain Lowry's appeal. The primary issues that divided the Lowry panel were: (1) whether federal law or state law controlled; and (2) if federal law controlled, what was the content of that law. In order to focus the parties' attentions on the concerns of the court, supplemental briefs were sought with respect to the following issues:
 
 
 11
 1. Upon the sale on the New York Stock Exchange of convertible debentures of the Baltimore and Ohio Railroad Company, does federal or state law govern whether accrued causes of action arising under the federal securities laws are automatically assigned to the subsequent purchasers of those debentures?2. If federal law applies, what is the content of that law?
 
 
 12
 3. If state law applies, which state's law governs, and what is the content of that law?
 
 
 13
 4. What law governs the assignability of any accrued common law or state statutory causes of action pleaded in the complaint?
 
 
 14
 5. If a different law of assignability applies to causes of action arising under federal and state law, what persons will be covered by the stipulation in Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R. Co., 680 F.2d 933 (3 Cir.1982), that convertible debenture holders who are not parties will receive any benefits ultimately decided to be due to the individual plaintiffs in that case?
 
 
 15
 6. If it is concluded that the plaintiffs have no federal cause of action, what disposition should be made of the remainder of the complaint?
 
 
 16
 The supplemental briefs filed by both of the parties agreed that federal law controlled. Lowry argued that federal law would recognize automatic assignability, while the B & O argued otherwise. At oral argument before this court, in addition to the arguments found in their briefs, B & O argued for the first time that N.Y.Jud. Law Sec. 489 (McKinney 1968)[2] would, in any event, prohibit the Lowry plaintiffs from obtaining an assignment of their transferors' causes of action. B & O raised this section 489 argument ostensibly to counteract the reliance by Lowry on Phelan v. Middle States Oil Corp., 154 F.2d 978 (2d Cir.1946), and N.Y.Gen.Oblig. Law Sec. 13-107 (McKinney 1978),[3] which Lowry claims permits causes of action to be assigned without an express assignment.[4]
 
 
 17
 The per curiam opinion, which is entitled "Opinion of the Court," curiously makes no mention of the significant issue which divided the panel: i.e. whether federal or state law dictates the assignability of the Pittsburgh cause of action. Indeed, the per curiam opinion, without reference to whether federal or state law controls, reports that two members of the court do not reach the issue of assignability; that three members of the court would only recognize assignability if there were an express assignment--which there was not--and that the remaining three members of the court (two judges were recused) would hold that the Pittsburgh Terminal cause of action was automatically assigned to the Lowry plaintiffs as purchasers. Because I believe the issue of whether federal or state law controls is at the core of the Lowry litigation, and because, according to the tabulation recited in the per curiam opinion, a majority of the court has not expressed itself on the assignability issue, I am forced to write separately.II.
 
 
 18
 Lucile Lowry and Lowry-Zweig Corporation appeal from a summary judgment dismissing their class action complaint against the Baltimore and Ohio Railroad Company (B & O), the Chesapeake & Ohio Railway Company, and Chessie System, Inc. The complaint alleges that the defendants violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b) (1976), Rule 10b-5 thereunder, 17 C.F.R. Sec. 240.10b-5 (1982), and the common law when the B & O declared a dividend in the stock of Mid-Allegheny Corporation (MAC), a B & O subsidiary, on December 13, 1977, without giving notice to holders of B & O convertible debentures.
 
 
 19
 Details of the transaction are set forth in our recent opinions in Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R., 680 F.2d 993 (3d Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 475-76, 74 L.Ed.2d 621 (1982), and will not be repeated here, other than to set forth those facts necessary to focus on the issues which this case presents. Essentially, however, the circumstances in which these actions arose were as follows.
 
 
 20
 The B & O had sought to restructure its operations by transferring its non-rail assets to MAC and then distributing MAC stock to the B & O shareholders in the form of a dividend. One consequence of this arrangement was that the B & O convertible debentures, which previously could have been converted into B & O stock representing both B & O's rail and non-rail assets, became convertible into B & O stock which now represented only B & O's rail assets. The Lowry plaintiffs claimed that the value of the conversion option, and hence of the convertible debentures, would thus be reduced, unless the debentureholders could convert in time to qualify for the MAC dividend. The plaintiffs in the Pittsburgh Terminal action alleged that by deliberately not giving the B & O convertible debentureholders advance notice of the MAC dividend, the defendants unlawfully deprived them of the opportunity to convert before the record date, December 13, 1977. This in turn deprived the convertible debentureholders of the right to participate in the dividend. A panel of the court held in Pittsburgh Terminal, supra, the companion case to this action, that the failure to notify convertible debentureholders who held debentures on that date violated Rule 10b-5.
 
 
 21
 While in Pittsburgh Terminal, the plaintiffs were holders of B & O convertible debentures who acquired those securities prior to December 13, 1977, and held them on that date, the plaintiffs in the instant case acquired their debentures after December 13, 1977, and after the public disclosure that B & O had on that date declared a dividend in MAC stock.[5] The district court certified the plaintiffs as representatives of a class of persons who purchased their debentures on or after December 13, 1977, or who have converted or will convert their debentures into B & O stock on or after December 13, 1977. The plaintiffs contend that the class was too narrowly structured by the district court in that it did not include any holders of the convertible debentures who acquired them prior to December 13, 1977 and did not convert. The plaintiffs also assert that summary judgment should not have been entered against them.
 
 III.
 
 22
 In their complaint, the plaintiffs sought to represent a class consisting of "[h]olders of Debentures as of the time that final judgment is rendered, and ... [h]olders of Debentures who have or will have converted them into stock of B & O on or after December 13, 1977 and before final judgment is rendered." Cplt. p 27, App. at 8-9. In granting the plaintiffs' motion for class certification, the district court defined the class to consist of "persons who purchased their debentures on or after December 13, 1977, or who have or will convert their debentures into B & O stock on or after December 13, 1977." App. at 90. By doing so, it excluded debenture holders at the time of judgment who had acquired their debentures before December 13, 1977 and had not converted them. The plaintiffs assert that it was illogical for the district court to include persons in their class who purchased debentures before December 13, 1977 and subsequently converted them, but to exclude persons who purchased debentures before December 13, 1977 and retained them.
 
 
 23
 As the defendants note, there was no need for the court to include in the class any of the debentureholders who purchased debentures prior to the declaration of the MAC dividend, since the defendants had agreed in the Pittsburgh Terminal action to give such persons any benefits ultimately decided to be due to the individual plaintiffs in that case.[6] See Pittsburgh Terminal App. at 493a. Thus, to the extent that any debentureholders were excluded from the Lowry class, they suffered no prejudice. As this court stated in Carter v. Butz, 479 F.2d 1084, 1089 (3d Cir.1973), "[w]hile we might well have decided otherwise we conclude that the class action determination was within the range of discretion permitted by [Federal] Rule [of Civil Procedure] 23."
 
 IV.
 
 24
 I turn now to the question whether the plaintiffs, having acquired their convertible debentures after December 13, 1977, the date when the MAC dividend was declared, are in the same position as the Pittsburgh Terminal plaintiffs insofar as maintaining an action against the defendants for securities fraud under Rule 10b-5. The plaintiffs concede that since they purchased their debentures after the MAC dividend declaration on December 13, 1977, it was not they, but their predecessors in ownership, who were allegedly defrauded. Nevertheless, the plaintiffs maintain that the Rule 10b-5 claims associated with the dividend declaration run with the debentures by operation of law, and that they therefore have standing to sue the defendants even without having obtained any express assignment of the cause of action from the former debenture owners.[7]
 
 A.
 
 25
 The first consideration to be addressed is whether this court should look to federal or state law in addressing the plaintiffs' contentions. There appears to be little authority on this point, probably because it has generally been assumed that questions of standing under the federal securities laws must be governed by federal law. All the parties to this action at the panel level apparently found this proposition to be self-evident, and thus did not even address this issue. In their in banc briefs, both parties agreed that federal law controlled.
 
 
 26
 I agree with the parties' original assumption, and their later statements, that questions regarding rights under the federal securities laws must be decided on the basis of federal, and not state, law. Congress enacted the securities laws to vindicate a federal policy of protecting investors. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 195, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976); H.R.Rep. No. 1383, 73d Cong., 2d Sess. 1-5 (1934). It established certain standards of conduct in the securities industry, standards that were to be uniform throughout the nation. In doing so, it supplemented a regulatory regime that had, until then, consisted principally of an assortment of varying state laws. A necessary corollary of this unitary scheme of regulation is that remedies for the breach of duties imposed by the federal laws should be uniform across the nation. I am satisfied, therefore, that we should look to principles of federal law in the furtherance of these federal policies, rather than importing state law principles which vary according to the particular state involved and which are designed to further state goals that may differ from those embodied in the federal acts.[8]
 
 
 27
 The vast majority of securities transactions today are conducted on regional and national exchanges, often through the facilities of national brokerage firms. These transactions are entered into against a background of pervasive federal regulation. Under these circumstances, it would undoubtedly come as a surprise to many investors if their right to sue for federal securities fraud were to depend upon the law of a state whose role in the transaction had been completely incidental and never even contemplated.
 
 
 28
 Even if securityholders' rights under the federal securities acts came to be recognized as depending in part on state law, confusion and uncertainty would still reign because the determination of which state's law governed would turn on the fortuity of where the action was filed and on the choice-of-law principles applied by the forum. The question of assignability conceivably could be governed by the laws of various states, among others: the law of the state where the issuer of the securities was incorporated; the state where the stock exchange on which the securities were traded was located; the state where the purchased security was delivered or paid for; or the state in which the broker who arranged the transaction operated. For example, if a citizen of Ohio sold debentures issued by a Delaware corporation with its principal place of business in Illinois, through a stockbroker in Indiana, who executed the sale on the New York Stock Exchange, to a Kentucky broker on behalf of a purchaser in Tennessee, which state's law would apply? If this Tennessee purchaser brought a class action on behalf of all debenture purchasers, as the plaintiffs in this case have done, would his right to recover differ from other members of the class whose debentures were purchased, for instance, on the Pacific Stock Exchange in Los Angeles?
 
 The Supreme Court has recognized that
 
 29
 the doctrine of [Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ] is inapplicable to those areas of judicial decision within which the policy of the law is so dominated by the sweep of federal statutes that legal relations which they affect must be deemed governed by federal law having its source in those statutes, rather than by local law.... When a federal statute condemns an act as unlawful, the extent and nature of the legal consequences of the condemnation, though left by the statute to judicial determination, are nevertheless federal questions, the answers to which are to be derived from the statute and the federal policy which it has adopted. To the federal statute and policy, conflicting state law and policy must yield.
 
 
 30
 Sola Elec. Co. v. Jefferson Elec. Co., 317 U.S. 173, 176, 63 S.Ct. 172, 173, 87 L.Ed. 165 (1942) (citations omitted). In a case analogous to this one, involving a promissory note given to a bank by one of its directors in violation of the National Bank Act, the Court held that federal law, not state law, governed the validity of defenses to payment of the note. Deitrick v. Greaney, 309 U.S. 190, 200-01, 60 S.Ct. 480, 484-485, 84 L.Ed. 694 (1940).
 
 
 31
 In the area of securities regulation, Judge Friendly noted nearly two decades ago that
 
 
 32
 significant steps toward the development of a federal common law of corporate responsibility have already been taken by implying causes of action from and filling interstices in laws administered by the SEC.... When conduct by an "insider" in the sale or purchase of a listed security is challenged under the general language of Section 10(b) of the Securities Exchange Act or Rule X-10b-5 of the SEC, interstitial supplementation is a matter of federal law. Although in these cases the emphasis was on higher standards of conduct, development of federal law can also protect against extreme or unrealistic requirements imposed by a state.... [F]or corporations whose business is of national concern, federal law will insure standards that are high but not too high....
 
 
 33
 Friendly, In Praise of Erie--And of the New Federal Common Law, 39 N.Y.U.L.Rev. 383, 413-14 (1964).
 
 
 34
 The authority that does exist with respect to the issue presented in this case holds that federal common law, not state statutes or decisional law, governs whether causes of action under the federal securities laws run with the affected securities and hence are automatically assigned to subsequent purchasers of those securities. 3 L. Loss, Securities Regulation 1817 (2d ed. 1961). See Western Auto Supply Co. v. Gamble-Skogmo, Inc., 348 F.2d 736, 739-41 (8th Cir.1965) ("federal and general common law" governs question of survivability of Sec. 16(b) action; state statutes provide "added support" for court's interpretation of federal common law), cert. denied, 382 U.S. 987, 86 S.Ct. 556, 15 L.Ed.2d 475 (1966); Mills v. Sarjem Corp., 133 F.Supp. 753, 761 (D.N.J.1955) ("In the absence of statutory pronouncement in this regard the federal common law will be applied."); cf. In re Fine Paper Litigation, 632 F.2d 1081, 1090 (3d Cir.1980) (status of assignments under the antitrust laws is a matter of federal law). But cf. Fund of Funds, Ltd. v. King, [1976-1977] Fed.Sec.L.Rep. (CCH) p 95,640 (S.D.N.Y. June 29, 1976) (referring to state law in deciding whether assignment of cause of action was effected).[9]
 
 B.
 
 35
 Having concluded that federal law governs the question whether federal securities law claims run with convertible debentures upon their sale, the content of that federal law must now be determined because the Securities Exchange Act is silent on this issue. Nor has any other federal statute which addresses this question been called to our attention. I suggest that we must therefore look to the federal common law of securities regulation for the answer.
 
 
 36
 As the plaintiffs acknowledge, there is only meager support in the cases for their theory that defrauded debentureholders automatically assign their causes of action under federal securities law when they sell their debentures. In my opinion, the better view is that the availability of such Rule 10b-5 actions should be limited to those investors who themselves have been defrauded, or who are express assignees of defrauded parties. Such an approach is necessary to ensure that compensation for fraudulent securities dealings inures to those persons who were injured by the fraud, rather than to corporate bounty hunters.
 
 
 37
 When the B & O refused to notify its convertible debentureholders of the MAC dividend on December 13, 1977, it was the persons holding convertible debentures on that date--not subsequent purchasers of those debentures--who were deprived of the opportunity to obtain the MAC dividend. As a consequence of the dividend declaration, the conversion option of the debentures was diluted, since the debentures, which previously had been convertible into stock representing both rail and non-rail assets, were now convertible into stock representing only rail assets. Thus, in a market in which traders deem the conversion option to be more significant than the income feature of the debentures, it would be expected that after December 13, 1977, the value of the debentures would decline to reflect the dilution of that option. Any sale by the debentureholders under such circumstances could not pass the loss onto a subsequent purchaser as the loss would already have been realized by the original debentureholder when less was received from the sale of the debenture than would have been received in the absence of the MAC dividend declaration. Completing this hypothesis, any subsequent purchasers who knew of the MAC dividend--as these plaintiffs concededly did, see note 5 supra--and thus of the lessened value of the debentures, presumably paid for the debentures they bought only their post-dividend worth.[10] In so doing, they could have sustained no loss and thus no injury.
 
 
 38
 In this light, absent any express assignment of a cause of action to the subsequent purchasers, it would be unjust and inconsistent with the remedial purposes of the securities laws to strip the right to recover from the convertible debentureholders who were actually injured, and grant it instead to subsequent purchasers who sustained no injury or loss from the Rule 10b-5 violation. Chief Judge Lord's discussion of this very point is persuasive:
 
 
 39
 While a security is of course transferred by its sale, the causes of action belonging to a prior holder do not pass with the transfer of the security. The provisions of the securities acts relied upon here create rights of action on the part of investors who have been harmed by the misconduct of others. Those rights belong to the persons who have suffered injury. They do not attach for all eternity to the security itself, to pass forever from the person who has been harmed to be asserted by others who have not. To adopt plaintiffs' extraordinary theory would be to deprive injured persons of their rights and give their causes of action to one who has suffered no injury himself but who simply has been shrewd or lucky enough to have put his hands on a security that once belonged to a person who was defrauded.
 
 
 40
 Independent Investor Protective League v. Saunders, 64 F.R.D. 564, 572 (E.D.Pa.1974).[11]
 
 
 41
 Although Phelan v. Middle States Oil Corp., 154 F.2d 978, 999-1002 (2d Cir.1946), appears to take a different view, that opinion is on balance less convincing than that in Saunders. Phelan did not involve an action under the federal securities laws, but instead was a receivership case. The court based its decision that the claim there asserted ran with the bonds on the belief that a wrongdoing trustee should not be relieved of liability if a bondholder, unaware of the trustee's malfeasance, sells his bonds. However Phelan may be read, in the context of this case, there is no reason why an opportunistic subsequent purchaser, rather than the original injured investor, should serve the role of policing improper corporate conduct.
 
 
 42
 Since I would hold that under federal law, the Rule 10b-5 action did not run with the debentures, the plaintiffs, as subsequent purchasers, in my view lack standing to assert their claims of federal securities fraud associated with the dividend declaration. Accordingly, I would affirm the district court's order which entered summary judgment for the defendants on the plaintiffs' section 10(b) and Rule 10b-5 claims.[12]
 
 C.
 
 43
 In their complaint, in addition to jurisdiction alleged under section 27 of the Securities Exchange Act, 15 U.S.C. Sec. 78aa (1976), the plaintiffs also alleged that the district court had diversity jurisdiction over their state law claims against the defendants.[13] Thus, although I have concluded that the plaintiffs lack standing to assert federal securities law claims because under federal common law, those claims were not automatically assigned to them upon their purchase of the debentures, I cannot overlook the state law claims asserted in their complaint which have yet to be resolved, and which they may have standing to pursue under whatever state law is found to be appropriate considering Pennsylvania choice-of-law rules.[14] See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). As to these state law claims, I recognize that among other outstanding issues are the issues of standing under state law, choice of law, and jurisdiction[15] which have not been presented on this appeal and which have not been decided by the district court. Under these circumstances, it is inappropriate for us to address them. Moreover, defendants raise for the first time before this court the impact of N.Y.Jud. Law Sec. 489 (McKinney 1968). This issue is also inappropriate for our determination. I would therefore leave such questions to be determined by the district court in the event the plaintiffs persist in pressing these claims on remand.[16]
 
 V.
 
 44
 Accordingly, I would affirm the order of the district court certifying the plaintiff class. I would also affirm the order of May 15, 1981 which granted summary judgment for the defendants, but only insofar as that order pertains to the plaintiffs' federal securities law claims. I would reverse so much of the May 15, 1981 order granting summary judgment to the defendants as pertains to the plaintiffs' state law claims and remand for the further proceedings which I have indicated.[17]
 
 
 45
 ADAMS, Circuit Judge, concurring in the judgment.
 
 
 46
 The Supreme Court in Chiarella v. United States declared that liability for non-disclosure of material information under the federal securities laws cannot be enforced absent a duty to speak. 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980). In Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R., 680 F.2d 933 (3d Cir.1982), a divided panel of this Court held that Rule 10b-17, 17 C.F.R. Sec. 240.10b-17 (1982) established such a duty, and imposed liability on The Baltimore and Ohio Railroad for failure to notify its convertible debenture holders of the Mid-Allegheny Corporation dividend prior to the declaration of that dividend on December 13, 1977. As I explained in dissent, I believe that Rule 10b-17 was promulgated for an entirely different purpose, not intended to deal with the situation presented in Pittsburgh Terminal, and thus cannot impose a duty to disclose pending dividends which may affect the value of the conversion feature of convertible debentures. Pittsburgh Terminal Corp. v. Baltimore & O.R.Co., supra, 680 F.2d at 953-954.
 
 
 47
 The Pittsburgh Terminal defendants filed a petition for rehearing en banc, which was denied. They subsequently filed a petition for certiorari in the Supreme Court, which was also denied. B. & O. R.R. Co. v. Pittsburgh Term. Corp., --- U.S. ----, 103 S.Ct. 476, 74 L.Ed.2d 621 (1982). In light of these events, I am now satisfied that the panel's interpretation in Pittsburgh Terminal is the law of this Circuit. I continue to believe that the dissent in that case was correct and to hope that this Court or the Supreme Court will eventually reject the majority's analysis. This is, however, not an appropriate situation in which to attempt to vindicate my position, since such an effort could compromise judicial integrity and cause confusion. I therefore reach the question whether the cause of action recognized in that case was automatically assigned to those who purchased the convertible debentures with knowledge of the Mid-Allegheny dividend.
 
 
 48
 For reasons advanced by Judge Garth, I agree that federal law governs the assignability of causes of action arising under the federal securities laws, and that federal law does not provide for the automatic assignment of such causes of action. The securities laws were enacted to protect investors from the fraudulent manipulation of the securities markets, not to encourage windfall profits arising out of speculation in lawsuits.
 
 
 49
 I also agree that it would be inappropriate for this Court to decide at this time whether state law causes of action which may or may not exist were automatically assigned to the Lowry plaintiffs at the time they purchased their B & O convertible debentures. These are issues that should be decided in the first instance by the district court, if it has diversity jurisdiction or if it decides to exercise pendent jurisdiction over those state claims that may be asserted on remand.[1]
 
 
 50
 ALDISERT, Circuit Judge, concurring and dissenting, with whom HUNTER, Circuit Judge, joins.
 
 
 51
 This case has produced a flock of opinions representing diverse and distinct points of view. Chief Judge Seitz and Judges Gibbons, Garth, Sloviter, and Becker are of the view that persons who held convertible debentures of the Baltimore & Ohio Railroad on December 13, 1977 have a cause of action under federal law. Moreover, Chief Judge Seitz and Judges Gibbons and Becker are of the view that this right of action could be automatically assigned to subsequent purchasers. Judges Adams, Garth, and Sloviter, on the other hand, would hold that assignment of the cause of action cannot occur automatically but requires an express agreement which is not present here. The court is unanimous, however, in its decision to remand the case for the purpose of determining what state law rights may be asserted by appellants under either the diversity or pendent jurisdiction of the district court.
 
 
 52
 I concur in the judgment that no federal cause of action is available to these appellants. I do not meet the question of assignability because I conclude that there is simply no federal cause of action available for assignment, be it automatic or otherwise.
 
 
 53
 The members of this court who believe that a federal cause of action exists rely on the separate opinions of Judges Gibbons and Garth in the panel decision of Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R., 680 F.2d 933 (3d Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 476, 74 L.Ed.2d 621 (1982). As Judge Garth makes clear in his separate opinion today, however, Pittsburgh Terminal holds only that Rule 10b-17 requires that notice be given to holders of convertible debentures when a common stock dividend is declared.[1] Rule 10b-17 provides that:
 
 
 54
 (a) It shall constitute a "manipulative or deceptive device or contrivance" as used in section 10(b) of the Act for any issuer of a class of securities ... to fail to give notice in accordance with paragraph (b) of this section of the following actions relating to such class of securities:(1) A dividend or other distribution in cash or in kind, except an ordinary interest payment on a debt security, but including a dividend or distribution of any security of the same or another issuer; ....
 
 
 55
 17 C.F.R. Sec. 240.10b-17 (1982) (emphasis added). Thus, if Pittsburgh Terminal remains the law of this court, failure to provide this notice gives rise to a federal cause of action for damages.
 
 
 56
 Because an in banc court is free to review and overrule the decision of a previous panel. United States Court of Appeals for the Third Circuit, Internal Operating Procedures ch. VIII, C., this appeal provides an appropriate vehicle to examine the precepts which, up until now, had only been before the Pittsburgh Terminal panel. Thus, no barrier prevents us from considering whether those who held debentures as of December 13, 1977 have a federal cause of action. Also, it cannot be argued, consistent with established principles of federal jurisprudence, that last rites were administered to this issue by the Supreme Court's denial of certiorari in Pittsburgh Terminal. "For [it is] the well-settled view that denial of certiorari imparts no implication or inference concerning the Court's view of the merits."[2] Hughes Tool Co. v. Trans World Airlines, Inc., 409 U.S. 363, 366 n. 1, 93 S.Ct. 647, 650 n. 1, 34 L.Ed.2d 577 (1973) (citing Maryland v. Baltimore Radio Show, 338 U.S. 912, 919, 70 S.Ct. 252, 255, 94 L.Ed. 562 (1950) (Frankfurter, J.)).
 
 
 57
 I find the reasoning supporting the judgment in Pittsburgh Terminal unpersuasive. I adopt the rationale contained in the following excerpt from Judge Adams' Pittsburgh Terminal dissent and conclude that no federal right of action exists. After determining that B & O had no contractual obligation to provide advance notice to its convertible debenture holders of the common stock dividend, Judge Adams stated that:
 
 
 58
 Judge Gibbons has concluded that Rule 10b-17 applies to the situation at hand because "B & O is the issuer of the convertible debentures, the MAC distribution is a dividend of a security, and that dividend related to the convertible debentures since it was material to a decision about exercising the conversion option." At 941. Judge Garth, concurring exclusively on this ground, stresses that, in his view, "a dividend 'relates to' a security if the declaration of that dividend makes the security significantly more or less valuable...." At 945. Because the B & O debentures were of considerably less value after the declaration of the MAC dividend, Judge Garth has concluded that the declaration of the dividend "is an action which clearly 'relates to' " that class of securities.
 
 
 59
 ... [T]hese considerations are not sufficient to establish that the dividend declaration "related to" the class of debenture securities as that term is used in Rule 10b-17. Put simply, Rule 10b-17 never was meant to deal with a situation similar to that before us today.
 
 
 60
 Nothing in the Commission's "Notice of Proposed Rule Making" or in the language of the rule itself suggests that Rule 10b-17 was intended to override the common law and accord debenture holders significant additional substantive rights. When the Rule was proposed by the Securities Exchange Commission in 1971, it was described as a rule "to require companies whose securities are publicly traded to furnish public investors with timely advance notice of the right to receive dividend[s] and other rights which accrue to holders of record of a specified class of securities as of a specialized date ('the record date')." 36 Fed.Reg. 3430 (1971). In other words, the Rule was designed to ensure that purchasers of securities receive all the fruits of the transaction to which they legally are entitled --namely, distributions made after the sale but before the change in ownership is reflected in the corporation's record books....
 
 
 61
 The differences between the scenario depicted by the SEC and the present case could not be more obvious. In the situation described by the SEC, the purchaser--independent of Rule 10b-17--has accrued the right to receive certain benefits. In such a case, the Rule acts simply to assure that these rights will not be impeded because of the inadequacies inherent in corporate bookkeeping. Here, in contrast, the debenture holders have a right to convert their debentures into shares of common stock. That right has not been defeated. Under well-established common law principles, however, they have no right--unless otherwise specified in the debenture--to notice of corporate actions that may affect the value of the conversion option.
 
 
 62
 Had the debenture holders foreseen the possibility that B & O would spin off its non-rail assets, arguably they may have bargained for--and paid for--the right to advance notice of the event. Despite the well-settled precedent of Pratt [v. American Bell Telephone Co., 141 Mass. 225, 5 N.E. 307 (1886) ] and Parkinson [v. West End St. Ry. Co., 173 Mass. 446, 53 N.E. 891 (1899) ], however, the B & O indenture did not require such notice to the debenture holders and the price of the debenture presumably reflected this fact. For this Court today--almost thirty years after the drafting of the indenture--to ignore what was set forth as the intent of the parties and fundamentally to alter the terms of the contract is, in my view, not only legally erroneous but improvident.
 
 
 63
 680 F.2d at 952-54 (footnotes omitted).
 
 
 64
 There are yet other sound reasons for not meeting the assignability issue. Putting aside considerations that make suspect a gratuitous viewpoint that states, "Were I to meet this issue, I would hold, etc.," I fear that going off on an alternate ground might dilute the expression of my firmly held conviction that the December 13, 1977 debenture holders had no federal cause of action to assign. It is basic to our federal judicial system that, as to subject matter jurisdiction, the reach of the federal courts shall not exceed their statutory grasp as established by Congress. In determining that grasp, courts should not torture statutory language, legislative history, or agency regulations to fashion a cause of action where none has been expressly or impliedly provided by Congress. While my views on this subject have not always carried this court, see, e.g., Ash v. Cort, 496 F.2d 416, 426-29 (3d Cir.1974) (Aldisert, J., dissenting), they have found a modicum of acceptance elsewhere, see, e.g., Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).
 
 
 65
 Accordingly, I reach only the threshold issue, concluding that the original debenture holders have no federal cause of action and, a fortiori, neither do their putative assignees.
 
 
 66
 GIBBONS, Circuit Judge, dissenting.
 
 
 67
 I dissent from the court's judgment for two independent reasons. First, the method by which the court arrived at a judgment is fundamentally inconsistent with sound appellate practice in the courts of appeals and will bring this court into disrepute. Second, even if the announced judgment had been arrived at properly, it is legally wrong.
 
 I.
 A. Why We Have In Banc Hearings
 
 68
 In March of 1940 this court by rule adopted a procedure for hearing cases in banc.[1] The court was prompted to do so by the disedifying spectacle of the Supreme Court having to resolve intra-circuit conflicts among panels of judges in the Court of Appeals of the Fifth Circuit.[2] Prior to the adoption of our local rule, the view had been expressed that such intra-circuit conflicts were the necessary consequence of the fact that in some circuits there were more than three circuit judges, while under the governing statute the court was composed of three of them.[3] Judge Biggs wrote:
 
 
 69
 A court, as distinguished from the quorum of its members whom it may authorize to act in its name, cannot consist of less than the whole number of its members.... To hold otherwise is not merely to affirm a plain contradiction in terms, but is also to destroy the authority of the court as a court and to open the way to possible confusion and conflict among its personnel and in its procedure and decisions.
 
 
 70
 117 F.2d at 70 (emphasis supplied). Thus from the outset this court, which first made use of the in banc device, did so for the purpose of preventing the erosion of judicial authority which would inevitably result when separate groups of judges in the same court decide that they were free to do their own thing. This court's view prevailed in the Supreme Court, which observed:
 
 
 71
 Certainly, the result reached makes for more effective judicial administration. Conflicts within a circuit will be avoided. Finality of decisions in the circuit courts of appeal will be promoted. Those considerations are especially important in view of the fact that in our federal judicial system these courts are the courts of last resort in the run of ordinary cases.
 
 
 72
 Textile Mills Corp. v. Commissioner of Internal Revenue, 314 U.S. 326, 334-35, 62 S.Ct. 272, 277-278, 86 L.Ed. 249 (1941) (footnote omitted).
 
 
 73
 In the 1948 Judicial Code the Textile Mills holding was ratified by Congress. 28 U.S.C. Sec. 46(c) (1976 & Supp. V 1981). The statute was not received enthusiastically in one court, which held that a panel majority could decide not to permit rehearing.[4] The Supreme Court reversed with directions that the court of appeals establish a procedure governing the exercise of the full court's power to consider suggestions for in banc consideration. Western Pacific Railroad Corp. v. Western Pacific Railroad Co., 345 U.S. 247, 261, 73 S.Ct. 656, 663, 97 L.Ed. 986 (1953). In response to the Western Pacific case the present Fed.R.App. P. 35 was prepared. Like the statute, which codified the Court's holding in Textile Mills, the rule is directed at Judge Biggs' original concern that anarchy among the judges of a single court would destroy the authority of the court. We have enshrined that purpose in Chapter VIII(C) of our Internal Operating Procedures, which provides:
 
 
 74
 It is the tradition of this court that reported panel opinions are binding on subsequent panels. Thus, no subsequent panel overrules a published opinion of a previous panel. Court in banc consideration is required to overrule a published opinion of this court.
 
 
 75
 We order in banc consideration in cases "where consideration by the full court is necessary to secure or maintain uniformity of ... decisions...." Third Circuit Internal Operating Procedures, ch. VIII B(1) (revised Sept. 1, 1978).
 
 B. This Case
 
 76
 The judgment of the court in banc in this case is entirely inconsistent with the fundamental policy behind 28 U.S.C. Sec. 46(c) and Federal Rule of Appellate Procedure 35. Instead of securing or maintaining the integrity of circuit doctrine, the in banc device has in this instance been used in a manner so inconsistent with that purpose that Judge Biggs must be turning in his grave.
 
 1. Prior Proceedings
 
 77
 Lucile Lowry and Lowry-Zweig Corp. (the Lowrys) are before us on appeal from a summary judgment dismissing their class action complaint against the Baltimore and Ohio Railroad Company (B & O), the Chesapeake & Ohio Railway Company (C & O), and Chessie System, Inc. (Chessie). The suit complains of the action of B & O in declaring a dividend in the stock of Mid-Allegheny Corporation (MAC), a B & O subsidiary, on December 13, 1977, without giving notice to holders of B & O convertible debentures. It was filed on October 22, 1979. On that date a prior suit, Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R. Co., was already on file challenging the same stock dividend.
 
 
 78
 In the Pittsburgh Terminal case the plaintiffs, holders of B & O convertible debentures, sought class action certification, which was denied as a result of an agreement between B & O and the Indenture Trustee that should plaintiffs prevail all debenture holders similarly situated would be accorded the treatment required by any judgment in plaintiffs' favor.[5] The Lowry complaint was referred to the same trial judge. In the Lowry case, however, on April 7, 1980, he entered a Rule 23 class action order designating the Lowry plaintiffs as representatives of two separate classes: (1) persons who purchased B & O convertible debentures on or after December 13, 1977, and (2) persons who converted their debentures into B & O stock on or after December 13, 1977. The record before us in Lowry does not disclose the precise terms of the agreement between the Indenture Trustees and B & O. Thus we cannot tell whether either class represented by the Lowrys is within its terms. What we can tell, however, is that the Lowry plaintiffs represent a class including debenture holders who acquired their debentures after December 13, 1977, and debenture holders who acquired them before that date but converted them later. Motions to modify the class and to consolidate the Lowry case with the Pittsburgh Terminal case for trial were denied on June 16, 1980.
 
 
 79
 Pittsburgh Terminal went to trial. It resulted in a judgment in favor of the defendants on all counts. On appeal this court reversed, holding that, on the facts found in the district court with respect to the December 13, 1977 transaction, that transaction was a violation of section 10(b) of the Securities Act of 1934, 15 U.S.C. Sec. 78j(b) (1976). We remanded to the district court for a determination of appropriate relief. Pittsburgh Terminal Corporation v. Baltimore and Ohio R.R. Co., 680 F.2d 933, 943 (3d Cir.1982). On June 22, 1982 this court denied a petition for rehearing in Pittsburgh Terminal, and on November 29, 1982, the Supreme Court denied a petition for certiorari. B & O R.R. Co. v. Pittsburgh Terminal Corp., --- U.S. ----, 103 S.Ct. 476, 74 L.Ed.2d 621 (1982). Thus the Pittsburgh Terminal case has now been returned to the district court for determination of appropriate relief, which will of necessity require a determination of which class members are to receive the benefit of the agreement between the Indenture Trustee and B & O.
 
 
 80
 After the Pittsburgh Terminal case was tried and dismissed the defendants moved for summary judgment in the Lowry case. That motion was granted for the same reasons relied upon by the trial court in dismissing the Pittsburgh Terminal complaint. The Lowry plaintiffs appealed on their own behalf and on behalf of the two classes they represent. They represent one class of purchasers whose bonds were acquired after the December 13, 1977 transaction was a matter of public information. They represent another class--bondholders who converted after that date. The latter class includes purchasers who acquired their bonds before December 13, 1977 and converted after that date, as well as bondholders who both acquired and converted after that date. Moreover their complaint relies not only on section 10(b) but also on certain state law claims asserted both pendent to the section 10(b) claim and on the basis of diversity of citizenship. At least one Lowry appellant satisfies the jurisdictional amount requirement of 28 U.S.C. Sec. 1332 (1976). That diversity claimant is an adequate class representative of all class members satisfying jurisdictional amount who could derive benefit from a decree based on state law, including class members who are not diverse. Supreme Tribe of Ben-Hur v. Cauble, 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921). A decision against the Lowry plaintiffs on the section 10(b) claims will bind all class members of the two classes defined in the April 7, 1981 order. Thus the Lowry appeal presents a number of discrete legal issues including:
 
 
 81
 1. whether assignees of a section 10(b) claim may assert it;
 
 
 82
 2. whether such claims are assigned by operation of law upon sale of a security;
 
 
 83
 3. whether assignees of state law claims may assert those claims;
 
 
 84
 4. whether such claims are assigned by operation of law upon sale of a security;
 
 
 85
 5. whether holders of debentures who are owners of section 10(b) claims and state law claims lose that status when, with knowledge of those claims, they exercise a conversion privilege.
 
 
 86
 Those issues are entirely apart from the grounds upon which summary judgment was entered.
 
 2. The In Banc Ruling
 
 87
 The panel to which the Lowry appeal was assigned was unable to agree on a judgment. That necessitated action by the full court, which, because of recusals, is in this instance comprised of eight members. Three of the eight disagree with the judgment in Pittsburgh Terminal, which is now final. Five of the eight conclude that the Pittsburgh Terminal case was correctly decided. Two of those five and one of the three conclude that federal law requires an express assignment of a section 10(b) claim, and would affirm on that ground the dismissal of the Lowry class action, even though one class includes persons who acquired their securities prior to December 13, 1977 and converted thereafter. Implicitly, but without discussion, those three judges must assume, therefore, that the exercise of the conversion privilege as a matter of federal law destroyed the previously held section 10(b) claim. Three of the five judges who agree with the Pittsburgh Terminal ruling also agree that an express assignment of a section 10(b) claim is unnecessary, and that conversion of debentures did not destroy that claim. Two of the three judges who disagree with the Pittsburgh Terminal holding refuse to vote on the assignment and conversion issues. Thus, the opinion announcing the judgment of the court rests upon separate minority positions: two votes against the Pittsburgh Terminal holding and three votes on assignment and conversion. By withholding their votes on assignment and conversion two judges who disagree with Pittsburgh Terminal purport to achieve the result that a judgment can be entered resting upon separate minority viewpoints upon the governing law. It is true, of course, that there is no clear majority with respect to the assignment and conversion issues. The litigants, however, will certainly be left with the reasonable suspicion that the two judges who have withheld their votes on those issues do not agree that they would support an affirmance.
 
 3. The Judgment is Legally Unsupportable
 
 88
 There are two independent reasons why the two judges who disagree with the Pittsburgh Terminal holding may not in this case attempt to support a judgment based upon that disagreement, and thus why the judgment based on concurrent minority views may not stand.[6]
 
 
 89
 The first reason is that the judgment against the defendants in the Pittsburgh Terminal case on liability for a section 10(b) violation is final. That was not the case when the case was argued to the full court on November 8, 1982, since, although we had already denied a petition for rehearing, there was a petition for certiorari pending. When that petition was denied on November 30, 1982, before the entry of our judgment, however, the Pittsburgh Terminal liability judgment against the defendants became final for all purposes. With that final judgment extant the defendants are collaterally estopped from contending in this court or any other forum that they are not liable for a section 10(b) violation. All class members, whoever they may be, are protected against relitigation of the issues determined in the Pittsburgh Terminal case, even though not formally parties to that case. Allen v. McCurry, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); Parklane Hosiery Co. v. Shore, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1978); Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); Katz v. Carte Blanche Corporation, 496 F.2d 747, 759 (3d Cir.1974); Bruszewski v. United States, 181 F.2d 419 (3d Cir.), cert. denied, 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950); Pentland v. Dravo Corp., 152 F.2d 851, 856 (3d Cir.1945). The three judges who disagree with the Pittsburgh Terminal holding are simply not free to act on that disagreement in support of a judgment in favor of the defendants, because that ground of appeal is no longer available to the defendants.
 
 
 90
 The second reason is that even if the defendants were not collaterally estopped, the Pittsburgh Terminal opinion is a binding precedent which the three judges who disagree must follow until a majority of a court in banc chooses to overrule it. Judge Aldisert contends that because this case is before the court in banc each judge is free to disregard prior precedent. I agree that the court in banc is free to reconsider a prior precedent. But a court in banc can only act by majority vote. Taking the position that each member of a court in banc is free to do his or her own thing disregards the very purpose of the in banc rule. It reintroduces the very anarchical principle that Judge Biggs recognized when our original rule was drafted. The anarchism is compounded in this instance by the totally unwarranted practice of withholding votes on the dispositive issues in the case so that a combination of minority positions can achieve a result. Judge Aldisert justifies this practice on the ground that "going off on an alternate ground might dilute the expression of [his] firmly held conviction that the December 13, 1977 debenture holders had no federal cause of action to assign." Maj. op. at 734. That is the very willful disregard of precedent that concerned Judge Biggs when the in banc rule was first adopted by this court, and its exercise in an in banc court is even more likely, in his words, to destroy the authority of the court.
 
 
 91
 The unseemliness of the position taken by the judges willing to announce a judgment resting on two legal propositions, neither of which commands a majority, can be fully appreciated by considering the dilemma which the district court will face on remand in Pittsburgh Terminal. As noted above, there is an agreement with the Indenture Trustee that all bondholders similarly situated with the Pittsburgh Terminal plaintiffs will receive the benefit of the judgment. Inevitably the district court will be required to determine who are the beneficiaries of that agreement. The irresponsibility of this court in the instant case will make that task a nightmare. Looking at our decision, the district court will know that since only three judges take a stand against automatic assignment of section 10(b) claims, members of the class of post-December 13, 1977 bond purchasers cannot be collaterally estopped from claiming to be protected by the agreement. At the same time, since only three judges take a stand in favor of automatic assignment on sale, the court will be left in the unenviable position of guessing what the law of the circuit is. Were the question to be presented to me, the best I could do would be to guess that the silent brothers probably agree that assignment was automatic, or else they would have relied on that ground in order to affirm. The district court's dilemma is even more acute with respect to class members who bought bonds before December 13, 1977 and exercised a conversion privilege thereafter, for with respect to them only three judges have actually announced a position. Does the silence of five mean that those class members are collaterally estopped?
 
 
 92
 The difficulties which the district court will face on remand in Pittsburgh Terminal make it certain that the issues which divide the court in this in banc proceeding will be back before a panel of the court in the not too distant future. When that happens, if I am a member of the panel I will take the position that this decision has no binding effect as a precedent because it decides nothing, and that it has no collateral estoppel effect, even against the class members represented by the Lowrys, because the basis of the judgment is wholly indeterminate. Indeed, I would regard any effort to apply res judicata effect to a class action judgment predicated upon the concurrence of two legal propositions, neither of which commands a majority in the court which announced the judgment, to be a violation of due process of law. Thus in my view the district court will be free, in fashioning relief on remand in Pittsburgh Terminal, to disregard the non-decision in this case, and make an independent determination as to who should benefit from the agreement with the Indenture Trustee.
 
 
 93
 The one thing the district court may not do, however, two judges of this court to the contrary notwithstanding, is disregard Pittsburgh Terminal either as a judgment establishing defendants' liability or as a binding precedent. Both the district courts in this circuit and future panels of this court are bound by that precedent. Even if the two judges who chose to vote against the Pittsburgh Terminal holding today were to comprise a majority of a panel to which the issue were presented tomorrow, they would be bound by it. Thus this court's willingness to enter a judgment based on two propositions neither of which commands a majority has accomplished nothing except to bring its appellate process into disrepute.
 
 II.
 
 94
 The unfortunate inconclusive judgment in this case rests in part upon the view of three judges that as a matter of federal law an express assignment is required for the transfer of a section 10(b) claim. That issue involves not one question but two.
 
 
 95
 The first question is whether section 10(b) claims are assignable at all. It has been held repeatedly that they are. E.g., Western Auto Supply Co. v. Gamble-Skogmo, Inc., 348 F.2d 736, 739-41 (8th Cir.1965), cert. denied, 382 U.S. 987, 86 S.Ct. 556, 15 L.Ed.2d 475 (1966); International Ladies Garment Workers Union v. Shields & Co., 209 F.Supp. 145, 149-50 (S.D.N.Y.1962); Mills v. Sarjem Corp., 133 F.Supp. 753, 761 (D.N.J.1955). In the Mills case Judge Forman rejected the contention that actions for damages under the federal securities law were penal, and for that reason should not be considered assignable. The question whether a section 10(b) claim, or indeed any interest created by federal law, is assignable is in my view undoubtedly a federal law question. Obviously, it would be intolerable to permit the states to determine the transferability, and thus the value, of interests created by federal law. Moreover those cases holding that section 10(b) claims are freely transferable announce the proper federal rule. Any other rule would be inconsistent with the underlying policy behind that federal statute: the protection of security holders from manipulative or deceptive acts or practices. When such acts or practices have occurred litigation seeking a remedy is often protracted and expensive. Not all victims are so positioned that they can stand either the delay or the expense. Thus they should be able to sell their securities, and the cause of action, in the marketplace at a price which reflects the market's consideration of the value of the claim. Any other rule would compound the injury to the victim by requiring that he await the outcome of a lawsuit before realizing something of what has been taken by the wrongdoer.
 
 
 96
 The second question is whether or not an assignment has occurred. This in turn involves three sub-issues. The first is whether state or federal law decides the fact of assignment. The second is whether, assuming federal law applies, in the absence of a statute the federal common law demands a single uniform rule or looks in each instance to the law of the state where the transaction occurred. The third is whether, assuming a federal uniform rule is required, the court should examine the laws of the states to determine what the national consensus is. Each of these issues requires a separate analysis.
 
 
 97
 There is certainly no clear consensus that federal law decides the fact of assignment of interests created by federal law. Indeed the general rule has long been assumed to be otherwise. E.g., Miree v. DeKalb County, 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977) (state law determines standing as third party beneficiary of federal contract); Wallis v. Pan American Petroleum Corp., 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966) (validity of transfer of federal oil and gas lease determined by state law although federal statute made lease assignable); Bank of America National Trust & Savings Association v. Parnell, 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d 93 (1956) (state law determines rights on transfer among private parties of commercial paper of the United States); DeSylva v. Ballentine, 351 U.S. 570, 76 S.Ct. 974, 100 L.Ed. 1415 (1950) (ownership of copyright on death of author determined by state law); Becher v. Contoure Laboratories, 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752 (1929) (constructive trust of patent for invention determined by state law); New Marshall Engine Company v. Marshall Engine Company, 223 U.S. 473, 32 S.Ct. 238, 56 L.Ed. 513 (1912) (assignment of patent for invention decided by state law); Joy v. St. Louis, 201 U.S. 332, 26 S.Ct. 478, 50 L.Ed. 776 (1906) (assignment of federal land patent decided by state law); Shoshone Mining Company v. Rutter, 177 U.S. 505, 20 S.Ct. 726, 44 L.Ed. 864 (1900) (assignment of federal mineral patent decided by state law); Blackburn v. Portland Gold Mining Company, 175 U.S. 571, 20 S.Ct. 222, 44 L.Ed. 276 (1900) (claim to mining patent determined by laws of mining district in which land situated). These decisions reflect the patent reality that so long as an interest created by federal law is in fact transferable the national government no longer has any obvious interest in who owns it or what formalities were involved in its transfer. Transferability of property, no matter what law creates the property interest, is a matter of traditional state law of contract. Before the general rule that state law determines the transferability of interests created by federal law may be displaced, some palpable federal interest in doing so must be identified. There is nothing about a section 10(b) claim that distinguishes it in this respect from federal commercial paper, patents, copyrights, or land grants.
 
 
 98
 Assuming arguendo, however, that the fact of assignment should be recognized as one of federal common law, one must pass next to the question whether that common-law rule should not adopt the law of the place where the transaction occurred, so long as it does not impede the underlying federal policy. Early post-Erie efforts of the Supreme Court to develop federal common law rules were tellingly criticized for passing too quickly from the first to the second question. See Friendly, "In Praise of Erie--And of the New Federal Common Law," 39 N.Y.U.L.Rev. 383, 410 (1964) (Clearfield Trust compressed consideration of issue of need for federal common-law rule and issue of choice of such a rule). Sensitive, perhaps, to that criticism, the Court now requires a more thorough examination of the choice of law problem. United States v. Kimbell Foods, Inc., 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). In the Kimbell Foods case the issue was priority of liens stemming from federal lending programs managed by the Small Business Administration and the Federal Housing Administration. Pointing to Clearfield Trust v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), the Court held that because those agencies derive their authority to effect the loans in question from federal statutes, their rights are derived from federal law. 440 U.S. at 726, 99 S.Ct. at 1457. But that did not require resort to uniform federal rules, for
 
 
 99
 [w]hether to adopt state law or to fashion a nation-wide federal rule is a matter of judicial policy "dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effect upon them of applying state law." United States v. Standard Oil Co., 332 U.S. 301, 310, 67 S.Ct. 1604, 1609, 91 L.Ed. 2067 (1947).
 
 
 100
 Undoubtedly, federal programs that "by their nature are and must be uniform in character throughout the Nation" necessitate formulation of controlling federal rules.... Conversely, when there is little need for a nationally uniform body of law, state law may be incorporated as the federal rule of decision. Apart from considerations of uniformity, we must also determine whether application of state law would frustrate specific objectives of the federal programs. If so, we must fashion special rules solicitous of those federal interests. Finally, our choice-of-law inquiry must consider the extent to which application of a federal rule would disrupt commercial relationships predicated on state law.
 
 
 101
 Id. at 728-29, 99 S.Ct. at 1458-1459 (footnotes and citations omitted). Making this fairly complex interest analysis, the Court in Kimbell Foods unanimously held that the relative priority of private liens and consensual liens arising from government lending programs would be determined under nondiscriminatory state laws. If an interest analysis with respect to incorporation of federal law is required even when the government's own property interests are involved, a fortiori such an analysis is required before we reject state law respecting the assignability of privately-owned claims.
 
 
 102
 Addressing the question whether application of state law would frustrate the specific objectives of the federal program requires an identification of those objectives. With respect to section 10(b), the objective is to protect the interstate market in securities from manipulative and deceitful practices which once were tolerated under some state law. That objective is achieved so long as (1) someone owns the section 10(b) cause of action, and (2) the victim can freely transfer it to a party who can afford to await the results of a lawsuit. That exhausts the federal government's interests, so long as information about the claim is equally available to the victim and the assignee. Section 10(b) presumes a market in which traders have equal access to information, and no special duty of disclosure can be implied from it or any other provision of federal law which would require an outsider assignee to volunteer information.
 
 
 103
 Turning to the question whether a federal rule would disrupt commercial relationships, we must start with the proposition that the overwhelming mass of securities transfers takes place in the two great securities exchanges in New York City, and in that city's over-the-counter market. Buyers and sellers almost never see each other. Thus, imposing a requirement that there be an express assignment of a section 10(b) claim for all practical purposes makes such claims unassignable. The effect of making them for practical purposes unassignable will be that the marketplace cannot take into account any incremental market value which might have resulted from public information about the existence of the claim. It is true that the seller will retain the claim and can proceed with his own suit or await the outcome of a class action brought by someone else. That will be cold comfort, however, to a holder of a security who wants, and perhaps even needs, to sell it. Some investors can afford to speculate on the incremental market value which may be added to a security as a result of litigation, and can even afford to finance such litigation. The depositions on file disclose that this is precisely what the Lowrys did. For others in more necessitous circumstances the only practical alternative will be to realize in the marketplace what the security will bring here and now. A rule requiring an express assignment of a section 10(b) or any other federally based claim connected with it, practically impossible of accomplishment in the real world of the securities markets, would have the inevitable effect that the seller cannot realize any increment in the market based on public knowledge of its existence. Once the sale has occurred the seller will have almost no incentive to pursue the claim. An express assignment requirement, therefore, will inure primarily to the benefit of the wrongdoer.
 
 
 104
 In New York State, where the vast majority of securities transfers takes place, the state has expressly rejected the requirement of an express assignment, in a statute providing:
 
 
 105
 Unless expressly reserved in writing, a transfer of any bond shall vest in the transferee all claims or demands of the transferrer, whether or not such claims or demands are known to exist, (a) for damages or rescission against the obligor on such bond, ...
 
 
 106
 N.Y. [General Obligations Law] Sec. 13-107 (McKinney 1978). That provision, a part of the title on transfer of obligations and rights of the New York General Obligations Law, was recommended by the New York Law Revision Commission to change the rule of Smith v. Continental Bank & Trust Co., 292 N.Y. 275, 54 N.E.2d 823 (1944), that absent an express assignment of accrued causes of action for breach of fiduciary duties, such causes of action do not pass to the transferee of a corporate bond. It adopts precisely the opposite rule, advocated by Judge Jerome Frank in Phelan v. Middle States Oil Corp., 154 F.2d 978 (2d Cir.1946), that unless the seller of a bond expressly reserves accrued causes of action they pass with the transfer of the bond. See Recommendation of the Law Revision Commission to the Legislature Relating to the Transfer With Bonds of Claims Connected Therewith, Dec. 14, 1949, 9 Leg.Doc. No. 65(D), reprinted in New York State Law Revision Commission Report, Recommendations and Studies, at 25-47 (1950). Parties to a sale can agree otherwise, but when they do not memorialize a different intention, the statute fills in the gap in the transaction.
 
 
 107
 One effect of the change in New York law with respect to how transfer of accrued causes of action respecting bonds must be evidenced was to make the rule on bond transfers consistent with that respecting stock transfers. See N.Y. [Personal Property Law] Sec. 168, repealed by U.C.C. Sec. 10-102, eff. Sept. 27, 1964 (McKinney 1976) (repealed N.Y. version of the Uniform Stock Transfer Act, Section 7). The Uniform Commercial Code now deals with investment securities generally. It provides that "[u]pon delivery of a security the purchaser acquires the rights in the security which his transferor had or had actual authority to convey...." N.Y. [Uniform Commercial Code Law] Sec. 8-301 (McKinney 1964). Thus the Uniform Commercial Code and the New York General Obligations Law are consistent.[7]
 
 
 108
 The Uniform Commercial Code and the New York General Obligations Law reflect the judgment of the commercial world that marketability of securities will best be encouraged by a rule that upon transfer all increments of market value travel with the security unless expressly reserved. Carving out an exception for increments of market value resulting from public information about actual or potential section 10(b) claims will seriously interfere with commercial relationships in that marketplace.
 
 
 109
 That observation suggests the plain answer to the third question. Assuming the need for a uniform federal common-law rule about assignability of section 10(b) claims, what considerations would prompt the adoption of any rule other than that embodied in the New York General Obligations Law and the investment security transfer provision of the Uniform Commercial Code? The three judges who espouse a requirement of an express assignment mention the possibility of lack of uniformity, but it is their proposed rule which introduces lack of uniformity. The Uniform Commercial Code governs in any place where a market for investment securities is likely to exist. If a federal common-law rule is deemed appropriate to prevent the application of different rules elsewhere, it is the rule of the New York General Obligations Law and the Uniform Commercial Code which obviously should be adopted. See New York, N.H. & H.R.R. v. Reconstruction Finance Corporation, 180 F.2d 241 (2d Cir.1950), noted in 64 Harv.L.Rev. 342 (1950) (Negotiable Instruments Law a source of federal common law).
 
 
 110
 There are, moreover, overriding federal concerns which militate strongly against separating ownership of the federal law and state law claims attaching to an investment security. The federal courts have exclusive jurisdiction over claims predicated on section 10(b). 15 U.S.C. Sec. 78aa (1976). Such claims are frequently filed, as in this case, as class actions. The federal courts have a significant interest in the expeditious settlement of those claims. State law claims arising out of the transaction complained of must as a matter of practical necessity be filed as pendent claims so that they, too, can be disposed of in any settlement or litigated decree. A rule which for all practical purposes subdivides the ownership of claims in connection with investment securities along federal/state lines would make the settlement of class actions infinitely more difficult. Damages for state common-law fraud and for manipulative and deceptive acts and practices under section 10(b) will be largely identical, but different classes will be able to recover. The three judges who suggest that ownership should be subdivided in this manner observe with apparent equanimity that there is no absolute rule precluding double liability. Typescript, Judge Garth's opinion, at 731 n. 16. District judges who have to deal with class action settlements would not greet such a rule with equal equanimity.
 
 
 111
 Because the weird judgment in this case does not actually rest upon any majority rationale, the district court to which it is remanded will be faced with some difficult issues. We are remanding the state law claims. The defendants will be faced, in defending against those claims, with the collateral estoppel effect of the facts which were found in the Pittsburgh Terminal case. It seems highly unlikely that those facts will permit a judgment on all pendent state law claims in favor of the defendants. Thus it is highly likely that the class of bondholders who purchased after December 13, 1977 will prevail. At that point the district court will have to decide whether by virtue of the agreement with the Indenture Trustee the bondholders who sold to that class can also recover, even though they presumably recovered in the marketplace the increment of market value arising from public knowledge of the section 10(b) claim.
 
 
 112
 Moreover, the judgment affirms dismissal of the claims of bondholders who converted after December 13, 1977, although only this opinion and a footnote in Judge Garth's opinion mention that class. They, too, will have state common-law claims. If they prevail, however, the defendants will only have to pay once.
 
 III.
 
 113
 The entry of a judgment based on two legal propositions, neither of which commands a majority, is a disgrace to the judicial process. The scandal is compounded by the fact that two judges have voted to rest the judgment on grounds which the defendants are collaterally estopped from asserting. The other non-majority position, that a different rule of assignability applies to the assignment of federal and state claims incident to ownership of an investment security, is fundamentally unsound. The same rule of automatic assignment absent express reservation applies to all legal claims, federal or state, which are incidents of ownership of the transferred securities. Thus the only proper judgment in this case is an outright reversal and remand on all claims.
 
 
 114
 SEITZ, Chief Judge, with whom BECKER, Circuit Judge, joins, concurring and dissenting.
 
 
 115
 I concur in the judgment of the court insofar as it vacates the district court's dismissal of appellants' state law claims and remands those claims for further proceedings. I dissent from that part of the court's judgment that affirms the dismissal of appellants' claim under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b).
 
 I.
 
 116
 This appeal comes to us from a grant of summary judgment in favor of appellees. Summary judgment was based on the district court's decision in Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R., 509 F.Supp. 1002 (W.D.Pa.1981). Plaintiffs in Pittsburgh Terminal held convertible debentures of the Baltimore & Ohio Railroad [B & O] on December 13, 1977. They alleged that B & O's failure to provide advance notice to its convertible debentureholders of a December 13, 1977 dividend of Mid-Allegheny Corporation [MAC] to B & O's common stockholders violated Rule 10b-5, 17 C.F.R. Sec. 240.10b-5 (1982). The district court held in Pittsburgh Terminal that B & O's failure to provide advance notice of the December 13, 1977 dividend did not violate Rule 10b-5.
 
 
 117
 The Lowrys, class representatives in this case, purchased B & O convertible debentures after December 13, 1977. They claim that they hold their sellers' claims by assignment. The Lowrys brought a class action against appellees under section 10(b) based on the same conduct that underlay the 10(b) claim in Pittsburgh Terminal.
 
 
 118
 Before Pittsburgh Terminal was resolved by bench trial, appellees moved for summary judgment in this case on two grounds: first, the Lowrys purchased after December 13, 1977 and thus lacked standing to assert any 10(b) claim arising out of B & O's failure to provide advance notice of the MAC dividend; and, second, appellants were barred from asserting any such claim by the one year statute of limitations under Pennsylvania's Blue Sky Law, Pa.Stat.Ann. tit. 70, Sec. 1-504(a) (Purdon Supp.1982).
 
 
 119
 The district court denied that motion, rejecting appellees' first argument and deferring resolution of the second to trial on the merits. In rejecting appellees' first argument, the district court determined that those persons who held convertible debentures on December 13, 1977 held contractual rights to purchase the underlying common stock and thus had standing to assert a 10(b) claim under the rule of Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 751, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539 (1975) (recognizing that "the holders of puts, calls, options and other contractual rights or duties to purchase or sell securities have been recognized as 'purchasers' or 'sellers' of securities for purposes of Rule 10b-5").
 
 
 120
 The district court's class certification in this case included within the class both those persons who had purchased debentures before December 13, 1977 and had converted after that date and those who, like the Lowrys, had purchased after December 13, 1977.[1] However, in rejecting appellees' standing argument, the district court did not determine whether the Lowrys, and other class members who had purchased after December 13, 1977, [Lowrys] had been assigned the 10(b) claims of their sellers, nor whether they could assert those claims as assignees.
 
 
 121
 After a bench trial, the district court held in Pittsburgh Terminal that B & O's failure to make a timely disclosure of its December 13, 1977 dividend had not been accompanied by the scienter required under Rule 10b-5 and dismissed the case. Whereupon, appellees in the present case made a second motion for summary judgment. They argued that because appellants' 10(b) claim in this case was predicated on the same failure to disclose as the claim in Pittsburgh Terminal, the district court should dismiss appellants' 10(b) claim on the ground that B & O had not acted with the scienter required by Rule 10b-5. The district court agreed and granted appellees' second motion solely on the basis of its decision in Pittsburgh Terminal. Lowry v. Baltimore & Ohio R.R., No. 79-1504 (W.D.Pa. May 15, 1981).
 
 
 122
 Plaintiffs in both Pittsburgh Terminal and Lowry appealed. This court reversed the district court's decision in Pittsburgh Terminal, holding that B & O had a duty to provide advance notice to its convertible debentureholders of the MAC dividend and that in failing to make such a disclosure, B & O had acted with the scienter required to support a claim under Rule 10b-5. Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R., 680 F.2d 933 (3d Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 476, 74 L.Ed.2d 621 (1982).
 
 
 123
 The appeal in this case presents two questions: first, whether a violation or Rule 10b-5 has been established; and, second, whether a claim arising out of any such violation has been automatically assigned to the Lowrys.
 
 II.
 
 124
 I agree with this court's opinion in Pittsburgh Terminal that Rule 10b-17, 17 C.F.R. Sec. 240.10b-17 (1982), imposed on B & O the duty to give advance notice to its convertible debentureholders of the dividend in MAC stock and that the breach of that duty could support a claim under Rule 10b-5. I also agree that in failing to provide such notice, B & O acted with the scienter required to support a violation of Rule 10b-5. Because I agree with the panel in Pittsburgh Terminal that B & O's conduct violated Rule 10b-5, I need not decide whether appellants may also rely on the panel's judgment in Pittsburgh Terminal to collaterally estop appellees from relitigating that issue before this court sitting in banc.
 
 
 125
 Rule 10b-17 imposes a duty on the issuer of a publicly traded class of securities to give notice 10 days prior to the record date of any dividend or other distribution "relating to such class of securities." Although the common stock on which the MAC dividend was declared was not a publicly traded class of securities at the time of the declaration, the convertible debentures were. Thus, the question is whether the MAC dividend related to the convertible debentures within the meaning of the rule. Because the term "relating to" is not defined in Rule 10b-17, we must determine its meaning from existing case law under section 10(b).
 
 
 126
 This court has held that the purchaser of a convertible debenture who purchases relying on material misrepresentations in the equity prospectus may state a claim under section 10(b). Kusner v. First Pennsylvania Corp., 531 F.2d 1234, 1238 (3d Cir.1976). As Kusner recognizes, the value of the conversion privilege is inextricably tied to the value of the underlying common stock. The value of the common stock, in turn, depends largely on the issuer's dividend policy. B & O's convertible debentureholders had a contractual right to purchase B & O common stock at a given price. To exercise their conversion options as informed investors, the bondholders had to know the value of the stock underlying that option. Thus, as both a practical matter and for purposes of section 10(b), I believe that the MAC dividend related to the publicly traded convertible debentures.
 
 
 127
 I believe that Rule 10b-17 imposed on B & O a duty of timely disclosure the breach of which is, in this case, sufficient to support a claim under Rule 10b-5. Thus, I need not decide whether the Indenture Agreement or B & O's listing agreement with the New York Stock Exchange imposed similar duties.
 
 III.
 
 128
 As discussed above, the district court granted summary judgment in this case on the basis of its decision in Pittsburgh Terminal that B & O's conduct did not violate Rule 10(b)-5. I believe, as did the majority of the panel in Pittsburgh Terminal, that the district court's decision in Pittsburgh Terminal was incorrect. Thus, I would not affirm the district court's dismissal of appellants' 10(b) claim in this case on that basis. Appellees may nevertheless prevail against the Lowrys if this court determines that the Lowrys do not hold a valid assignment of any 10(b) claim arising out of B & O's failure to provide advance notice of its MAC dividend. I turn now to that issue.
 
 
 129
 Because the district court held in this case that B & O's failure to provide advance notice did not violate section 10(b), it never reached the question whether any 10(b) claim had been assigned to those who purchased after December 13, 1977. Normally, I would prefer to have the district court address the question of assignment on remand. However, the assignment issue has been fully briefed and argued before this court, and in the interest of judicial economy, I agree that we should resolve that issue now.
 
 
 130
 Both parties concede that the section 10(b) claim is assignable as a matter of federal law, and both relevant case law and commentary indicate that this is so. See, e.g., Mills v. Sarjem Corp., 133 F.Supp. 753, 761-62 (D.N.J.1955); 3 Loss, Securities Regulation 1817-19 (2d Ed.1962). The Lowrys did not obtain an express assignment of their sellers' claims. However, they claim that any 10(b) claim that had accrued to their sellers was automatically assigned to them as purchasers of the convertible debentures. If such a claim was not automatically assigned, the Lowrys may not prevail on the 10(b) claim they assert here. For the reasons set forth below, I believe that the 10(b) claim was automatically assigned whether federal or state law controls that issue.
 
 
 131
 If federal law controlled, it would of course be federal common law, and this court would have to determine its content. The content of federal common law may be supplied either by fashioning a nationwide federal rule or by adopting state law. United States v. Kimbell Foods, Inc., 440 U.S. 715, 728, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979). If this court determined that a uniform federal rule should supply the content of federal common law in this case, I believe that the rule would provide for automatic assignment of federal securities claims to the purchaser of the underlying security, absent an explicit reservation by the seller.
 
 
 132
 The primary purpose of section 10(b) and the rules promulgated thereunder is to protect investors from manipulative practices in the securities market and to deter such practices in the first instance. Often investors will sell their securities before any fraud or deception is discovered. They will then have little incentive to keep abreast of developments relating to their former investments and thus may never learn of any fraud or deceit. Assignment of a 10(b) claim places the claim with the person most likely to learn of its existence, thus increasing the remedial purposes of the statute and furthering its deterrence goals.
 
 
 133
 A rule of automatic assignment increases the transferability of 10(b) claims and is more likely to advance the policies underlying the federal statute than a rule requiring express assignment. Requiring express assignment in the current securities market would drastically inhibit the effective assignability of 10(b) claims. The vast majority of securities transactions takes place in a faceless market where buyers and sellers never meet and may never have the opportunity to negotiate an express assignment. Under a rule of automatic assignment, the claim is transferred on purchase to the party most likely to learn of its existence, again maximizing the prophylactic value of the federal statute.
 
 
 134
 If federal common law were supplied by adopting state law, or if state law controlled, the law of New York would provide the law in this case. Under that law, the 10(b) claim would be automatically assigned to the purchaser of the convertible debenture absent a contrary agreement. N.Y. [U.C.C.] Law Sec. 8-301 (McKinney 1964)[2]; N.Y. [Gen.Oblig.] Law Sec. 13-107 (McKinney 1978).[3]
 
 
 135
 Because I believe that, absent an express reservation, assignment of the 10(b) claim in this case is automatic under either federal or state law, I would hold only that the Lowrys obtained an automatic assignment of the federal claim when they purchased the convertible debentures.[4] I would save for a subsequent case the question whether assignment of federal securities claims is controlled by federal or state law.[5]
 
 IV.
 
 136
 At oral argument before the in banc court, appellees for the first time raised a New York champerty statute as an affirmative defense to the Lowrys' claim that they held as assignees any claims arising out of B & O's December 13, 1977 conduct. N.Y. [Jud.] Law Sec. 489 (McKinney 1968).[6] The parties agree that if federal law governs the question of assignment, the federal law will adopt and apply state law to determine whether the assignment of the federal claim is champertous. Martin v. Morgan Drive Away, Inc., 665 F.2d 598, 604-05 (5th Cir.), cert. dismissed, --- U.S. ----, 103 S.Ct. 5, 73 L.Ed.2d 1394 (1982) (holding that as a matter of federal law, the federal courts should look to state law to determine whether assignment of a federal antitrust claim is champertous). Thus, the validity of this defense does not depend on whether federal or state law governs the assignment question.
 
 
 137
 Because I believe that B & O's conduct, under the facts of this case, violated Rule 10b-5 and that the 10(b) claim has been automatically assigned to the Lowrys, I would reverse and remand the district court's dismissal of appellants' 10(b) claim for further proceedings. I would prefer the parameters of the champerty issue to be addressed by the district court in the first instance. Thus, on remand I would have the district court determine, among other things, whether the champerty statute that appellees assert as an affirmative defense against the Lowrys governs the conduct at issue here.
 
 V.
 
 138
 I concur in the judgment of the court insofar as it remands appellants' state law claims. However, because I believe that appellants have stated a valid claim under section 10(b) of the federal securities law, I would remand appellants' state law claims as pendant claims. Because I believe that the district court has pendant jurisdiction over appellants' state law claims, I do not join in that part of the court's judgment directing the district court to consider whether appellants may maintain those claims in diversity.
 
 
 
 [1]
 The class certified by the district court actually included people who had purchased B & O convertible debentures after December 13, 1977, as well as people who had purchased the debentures before December 13, 1977, but had converted them after that date. The assignability question thus bears only on the claims of the first set of class members; we assume, without deciding, that the second set of class members will be covered by the stipulation fashioned by the parties to Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R. Co., 680 F.2d 933 (3d Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 476, 74 L.Ed.2d 621 (1982), which stipulation provided that holders of debentures as of December 13, 1977, would be treated in the same manner as the Pittsburgh Terminal plaintiffs
 
 
 [1]
 Although Judge Gibbons predicated the B & O's duty to disclose on other grounds as well, I concurred only as to Rule 10b-17, which constitutes the holding of the case. See Pittsburgh Terminal Corp. v. Baltimore & O. R.R., 680 F.2d 933, 943-46 (3d Cir.) (Garth, J., concurring in part and concurring in the judgment), cert. denied, --- U.S. ----, 103 S.Ct. 475-76, 74 L.Ed.2d 621 (1982). Because the court denied a petition for rehearing in Pittsburgh, this court was on record at the time of our in banc consideration of Lowry as having held that a federal cause of action inured to the benefit of convertible bondholders who held those bonds on December 13, 1977. Here, of course, the plaintiffs acquired their debentures after that date and after public disclosure of B & O's dividend declaration
 
 
 [2]
 N.Y.Jud.Law Sec. 489 (McKinney 1968) provides in pertinent part:
 No person or co-partnership, engaged directly or indirectly in the business of collection and adjustment of claims, and no corporation or association, directly or indirectly, itself or by or through its officers, agents or employees, shall solicit, buy or take an assignment of, or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon; ...
 Any corporation or association violating the provisions of this section shall be subject to a fine of not more than five thousand dollars; any person or co-partnership, violating the provisions of this section, and any officer, trustee, director, agent or employee of any person, co-partnership, corporation or association violating this section who, directly or indirectly, engages or assists in such violation, is guilty of a misdemeanor.
 
 
 [3]
 N.Y.Gen.Oblig.Law Sec. 13-107 (McKinney 1978) provides:
 
 
 [1]
 Unless expressly reserved in writing, a transfer of any bond shall vest in the transferee all claims or demands of the transferrer, whether or not such claims or demands are known to exist
 
 
 [2]
 As used in this section, "bond" shall mean and include any and all shares and interests in an issue of bonds, notes, debentures or other evidences or indebtedness of individuals, partnerships, associations, or corporations, whether or not secured
 
 
 [3]
 [Defining term "indenture."]
 
 
 [4]
 Because the Sec. 489 and Sec. 13-107 claims should be presented to the district court in the first instance, I do not address them in this opinion. See Part IV C infra
 
 
 [5]
 Ezra Lowry, president of plaintiff Lowry-Zweig Corp. and husband of plaintiff Lucile Lowry, testified at his deposition that he had his wife purchase approximately $15,000 worth of B & O convertible debentures in late December, 1977, about a week after learning from his stockbroker that the B & O had declared a dividend in MAC stock on December 13, 1977. He stated that he had his wife purchase the debentures, even though he knew the record date for the MAC dividend had already passed, because he believed that "there was a very good chance that if we bought those debentures, we would have the probability of collecting the value of that dividend declaration." App. at 43. Mr. Lowry testified that he had his wife acquire additional debentures in April, 1978, on the basis of a conversation he had with his stockbroker about the Pittsburgh Terminal lawsuit. Id. at 46-47. Yet more debentures were purchased in July and September of 1978 in anticipation of a favorable settlement of the Pittsburgh Terminal litigation. Id. at 49-50
 
 
 [6]
 In his dissent, Judge Gibbons assumes I would hold that "the exercise of the conversion privilege as a matter of federal law destroyed the previously held section 10(b) claim" of class members who purchased debentures before December 13, 1977, and converted them after that date. At 737. That assumption is incorrect. On the contrary, although such persons may not properly be represented by the Lowrys (who had purchased their debentures after December 13, 1977), they will not be prejudiced by the judgment in this case because they will share in any benefits due the Pittsburgh Terminal plaintiffs by reason of the defendants' agreement. See Opinion of Seitz, C.J., concurring and dissenting, at 744 n. 1
 
 
 [7]
 Although express assignments of causes of action under the federal securities laws are effective, see Western Auto Supply Co. v. Gamble-Skogmo, Inc., 348 F.2d 736, 739-41 (8th Cir.1965), cert. denied, 382 U.S. 987, 86 S.Ct. 556, 15 L.Ed.2d 475 (1966); International Ladies' Garment Workers' Union v. Shields & Co., 209 F.Supp. 145, 149-50 (S.D.N.Y.1962); Mills v. Sarjem Corp., 133 F.Supp. 753, 761 (D.N.J.1955); 3 L. Loss, Securities Regulation 1817-19 (2d ed. 1961); 6 id. 3937-38 (Supp.1969), when the plaintiffs (and presumably other class members) acquired their debentures with knowledge that the record date for participation in the MAC distribution had already passed, they did not obtain any express assignment of any causes of action which might have accrued to the sellers as a result of B & O's December 13, 1977 actions
 
 
 [8]
 This is not to say that state law principles have no role to play in the area of securities regulation. The federal securities laws preserve a parallel system of state regulation and remedies which litigants can invoke in addition to any rights they may (or may not) have under federal law. See, e.g., Sec. 28(a) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78bb(a) (1976). The fact that a parallel system of state remedies exists underscores the propriety of applying federal law principles to actions invoking federal statutory remedies
 
 
 [9]
 Because federal law, not state law, governs whether claims under the federal securities laws run with a convertible debenture upon its sale, the provisions of N.Y.Gen.Oblig.Law Sec. 13-107 (McKinney 1978), vesting in the transferee of a bond all claims of the transferor, are not dispositive of the plaintiffs' standing to assert their federal claims. Moreover, N.Y.Jud.Law Sec. 489 (McKinney 1968), see note 2 supra (prohibiting assignments by corporations, and persons "engaged directly or indirectly in the business of collection and adjustment of claims," "with the intent and for the purpose of bringing an action or proceeding thereon") appears to dilute the plaintiffs' reliance on N.Y.Gen.Oblig.Law Sec. 13-107 (McKinney 1978). That issue, however, has yet to be resolved
 
 
 [10]
 I recognize that many market factors influence the price of a convertible debenture other than the value of its conversion option. Thus, the record in this case, which reveals that little change took place in the market price of the B & O debentures after December 13, 1977, see Pittsburgh Terminal App. at 316a, does not invalidate this analysis, which depends on the significance in general of the value of the conversion option--a significance not lost on the plaintiffs, who brought this suit precisely because of their claim to their full conversion rights. The plaintiffs asserted in their complaint: "Had proper notice been given of the declaration of the [MAC] dividend, Debenture holders would have realized the value thereof, either by converting their Debentures on or prior to the record date so as to obtain the dividend as shareholders of B & O or else by selling their Debentures for an enhanced price reflective of the dividend obtainable by conversion." Cplt. p 21, App. at 8
 
 
 [11]
 As the court stated in International Ladies' Garment Workers' Union v. Shields & Co., supra, 209 F.Supp. at 149:
 Of course by a mere assignment of securities the assignee does not acquire any and all rights of action that the assignor may have had against the person from whom he bought. One who has been defrauded by the sale of goods to him of a value less than they would have had if as represented retains the right of action for the amount of his damage unaffected by his parting with the goods.
 
 
 [12]
 The foregoing analysis of the plaintiffs' standing would also apply to any cause of action the plaintiffs might assert under Sec. 6 of the Securities Exchange Act, 15 U.S.C. Sec. 78f (1976), based on the B & O's alleged violation of its listing agreement with the New York Stock Exchange (NYSE). We thus need not decide whether an implied private right of action exists under Sec. 6
 
 
 [13]
 The complaint asserts that the defendants violated provisions of the indenture governing the debentures, the B & O's listing agreement with the NYSE, the NYSE Company Manual, and various NYSE rules and instructions. Cplt. paragraphs 15-20, App. at 6-7
 
 
 [14]
 See, e.g., note 8 supra
 
 
 [15]
 Although this court dismisses the Lowrys' federal claims, those claims were not so insubstantial as to divest the district court of the power to exercise pendent jurisdiction over the state claims. See Hagans v. Lavine, 415 U.S. 528, 545-50, 94 S.Ct. 1372, 1383-1385, 39 L.Ed.2d 577 (1974); Gagliardi v. Flint, 564 F.2d 112, 114 (3d Cir.1977), cert. denied, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978). Whether the district court should entertain these pendent state claims is a matter for the court's discretion. See Lentino v. Fringe Employment Plans, Inc., 611 F.2d 474, 478-80 (3d Cir.1979). Because the district court has jurisdiction over the state claims of those diverse parties satisfying the requisite $10,000 jurisdictional amount, I would find it somewhat anomalous for the district court to refuse jurisdiction over the pendent claims, all of which arise from a common nucleus of fact. However, that decision is one for the district court to make and I would remit that issue to the district court's discretion in the first instance
 In their briefs before the in banc court, the Lowrys argued that those diverse parties with claims of less than $10,000 could aggregate these claims to satisfy the jurisdictional amount, reasoning that the claims are "to enforce a single title or right in which they have a common and undivided interest." See Snyder v. Harris, 394 U.S. 332, 335, 89 S.Ct. 1053, 1056, 22 L.Ed.2d 319 (1969); Broenen v. Beaunit Corp., 305 F.Supp. 688, 691-92 (E.D.Wis.1969). Obviously, the district court need not reach this question unless it declines to exercise pendent jurisdiction over those diverse parties with claims of less than $10,000. I intimate no view with respect to this argument.
 Judge Sloviter does not join in this footnote. Instead, she joins in Part V of Chief Judge Seitz' separate concurring and dissenting opinion and would remand appellants' state law claims as pendent claims without directing the district court to consider whether appellants may maintain those claims in diversity.
 
 
 [16]
 The plaintiffs argue that if federal securities law claims still remain with the original debentureholders (since those claims do not run with the debentures), and fraud claims under state law are possessed by the plaintiffs as subsequent purchasers (since such claims, it is alleged, are automatically transferred with the security), the defendants may be subject to double liability: to the original debentureholders under federal law, and to the subsequent purchasers under state law. I do not decide here how such a situation, were it to arise, should be resolved, noting only that "[t]here is no absolute rule of [securities] law precluding double liability." 3 L. Loss, supra, at 1474. See McCandless v. Furland, 296 U.S. 140, 167, 56 S.Ct. 41, 50, 80 L.Ed. 121 (1935)
 
 
 [17]
 Therefore, I join in the per curiam Opinion of the Court, but only to the extent that the judgment which it announces is consistent with the views I have expressed in this opinion
 
 
 [1]
 Cf. Newark Morning Ledger Co. v. United States, 539 F.2d 929, 932 (3d Cir.1976)
 
 
 [1]
 In his Pittsburgh Terminal opinion announcing the judgment of the court, Judge Gibbons predicated B & O's duty to disclose on other grounds as well, but Judge Garth concurred only as to liability under Rule 10b-17. Judge Adams, the third panel member, dissented
 
 
 [2]
 In Baltimore Radio Show Justice Frankfurter stated:
 Inasmuch, therefore, as all that a denial of a petition for a writ of certiorari means is that fewer than four members of the Court thought it should be granted, this Court has rigorously insisted that such a denial carries with it no implication whatever regarding the Court's views on the merits of a case which it has declined to review. The Court has said this again and again; again and again the admonition has to be repeated.
 338 U.S. at 919, 70 S.Ct. at 255.
 
 
 [1]
 The original rule is set forth in Commissioner of Internal Revenue v. Textile Mills Corp., 117 F.2d 62, 63, 67 n. 4 (3d Cir.1940), aff'd, Textile Mills Corp. v. Commissioner of Internal Revenue, 314 U.S. 326, 62 S.Ct. 272, 86 L.Ed. 249 (1941)
 
 
 [2]
 See Commissioner of Internal Revenue v. Textile Mills Corp., 117 F.2d at 70 (referring to John Hancock Ins. Co. v. Bartels, 308 U.S. 180, 60 S.Ct. 221, 84 L.Ed. 176 (1939))
 
 
 [3]
 Lang's Estate v. Commissioner of Internal Revenue, 97 F.2d 867, 869 (9th Cir.1938)
 
 
 [4]
 Western Pac. R.R. Corp. v. Western Pac. R. Co., 197 F.2d 994, On Petitions for Rehearing, 197 F.2d 1012 (9th Cir.1952)
 
 
 [5]
 Pittsburgh Terminal v. Baltimore & Ohio R. Co., 509 F.Supp. 1002, 1009 (W.D.Pa.1981)
 
 
 [6]
 Judge Adams dissented in the Pittsburgh Terminal case, but concedes that he is now bound by its holding
 
 
 [7]
 The claims being asserted are not derivative shareholder actions. Thus the special rule as to such claims in Fed.R.Civ.P. 23.1, requiring that the plaintiff be a shareholder at the time of the action complained of, has no application. Compare W. Fletcher, Cyclopedia of the Law of Private Corporations Secs. 5980-81 (rev. perm. ed. 1980) (discussing state and federal rules concerning stockholders' derivative suits) with id. Sec. 5936.1 (discussing decisions holding that shareholder maintaining nonderivative action is not required to own stock at time of events complained of)
 
 
 [1]
 Pittsburgh Terminal was not a class action, but defendants in that case, appellees here, stipulated that if the plaintiffs prevailed in Pittsburgh Terminal, they would provide to all "similarly situated" convertible debentureholders the same relief provided to the named plaintiffs. It seems that all those who held convertible debentures on December 13, 1977 are covered by appellees' stipulation in Pittsburgh Terminal. Thus, to the extent that the class certification here includes within the class persons who held on December 13, 1977, it seems to sweep too broadly
 
 
 [2]
 Section 8-301 provides
 (1) Upon delivery of a security the purchaser acquires the rights in the security which his transferor had or had actual authority to convey....
 Under UCC Sec. 1-102(3), the seller may expressly reserve any such rights. "The effect of provisions of this Act may be varied by agreement...."
 
 
 [3]
 Section 13-107 provides
 Unless expressly reserved in writing, a transfer of any bond shall vest in the transferee all claims or demands of the transferrer, whether or not such claims or demands are known to exist, (a) for damages or rescission against the obligor on such bond, (b) for damages against the trustee or depositary under any indenture under which such bond was issued or outstanding, and (c) for damages against any guarantor of the obligation of such obligor, trustee or depositary.
 
 
 [4]
 To the extent that Independent Investor Protection League v. Saunders, 64 F.R.D. 564 (E.D.Pa.1974), holds to the contrary, I believe that it is incorrect
 I would hold only that assignment of the 10(b) claim in this case was automatic. I would not decide here whether such a claim would be automatically assigned to a subsequent purchaser if the seller had brought an action on the claim before the sale and that claim was still pending at the time of the sale.
 
 
 [5]
 Because I believe that the federal common-law rule of assignment would be the same in this case whether this court adopted state law or fashioned a uniform federal rule, I would not determine here which is preferable. See United States v. Kimbell Foods, Inc., 440 U.S. 715, 727-29, 99 S.Ct. 1448, 1457-1459, 59 L.Ed.2d 711 (1979) (articulating the factors to be considered in determining whether to adopt state law or to fashion a nationwide federal rule as the federal common law)
 
 
 [6]
 That law provides
 No person or co-partnership, engaged directly or indirectly in the business of collection and adjustment of claims, and no corporation or association, directly or indirectly ... shall solicit, buy or take an assignment of ... a bond, promissory note, bill or change, book debt, or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon....
 N.Y. [Jud.] Law Sec. 489 (McKinney 1968).